# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 14-20293

In re: ROBERT JAMES CAMPBELL,

Movant

United States Court of Appeals
Fifth Circuit
**FILED**
May 13, 2014
Lyle W. Cayce
Clerk

On Motion for Authorization to File
Successive Petition for Writ of Habeas
Corpus in the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and DENNIS and ELROD, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

Robert James Campbell, a death-row prisoner whose execution is scheduled for Tuesday, May 13, 2014, contends that he is intellectually disabled (formerly called "mentally retarded") and is, therefore, constitutionally ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002).[1] He has filed with this court a motion for authorization to file

---

[1] Campbell uses the term "intellectual disability" (which he says is the medical community's current preferred term) instead of "mental retardation," and we use that term here as well. *See Brumfield v. Cain*, 744 F.3d 918, 920 n.1 (5th Cir. 2014) ("[T]he preferred terminology for mental retardation is now 'intellectual disability.'"); *Henderson v. Thaler*, 626 F.3d 773, 782 n.1 (5th Cir. 2010) (Wiener, J., dissenting) ("As did the Supreme Court in *Atkins*, we have heretofore referred to 'mental retardation.' But, a recent act of Congress mandates use of the phrase 'intellectual disability' in place of 'mental retardation' in all federal enactments and regulations.") (citing Rosa's Law, Pub. L. No. 111-256 (Oct. 5, 2010)); *but see Hernandez v. Stephens*, 537 F. App'x 531, 533 n.1 (5th Cir. 2013) ("This court's changing terminology on its own serves little purpose other than to create ambiguity.").

a successive federal habeas corpus petition asserting his *Atkins* claim and a motion for stay of execution pending the resolution of that claim. For the reasons that follow, we grant both motions.

**I.**

Campbell was born in 1972. In 1991, a few months after his eighteenth birthday, he murdered Alexandra Rendon. Campbell and a friend kidnapped Rendon while she was at a gas station, pumping gas. They drove her to a remote area where Campbell eventually shot her in the back.[2] He was convicted of capital murder in 1992 in the District Court of Harris County, Texas. The judgment was affirmed in the Texas Court of Criminal Appeals in 1995. *Campbell v. State*, 910 S.W.2d 475 (Tex. Crim. App. 1995) (partial publication). During the following years, Campbell lodged several petitions for habeas corpus in Texas state courts and one petition in federal district court. None was successful.

On June 20, 2002, the Supreme Court held in *Atkins v. Virginia* that the death penalty, as imposed against the intellectually disabled, is excessive punishment under the Eighth Amendment, and, therefore, "the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." 536 U.S. at 321 (internal quotation marks omitted).

Campbell's attorney at the time, who believed but lacked proof that Campbell was intellectually disabled, began investigating for evidence to support Campbell's assertion of an *Atkins* claim. According to the representations and supporting evidence of Campbell's current counsel (not the attorney who represented him during the period immediately following

---

[2] Campbell's criminal conduct is described in detail in *Campbell v. Dretke*, 117 F. App'x 946 (5th Cir. 2004).

*Atkins*), Campbell's attorney then contacted each of the schools Campbell had attended and requested their records concerning him.[3] The schools provided scant materials showing generally that Campbell had performed poorly in his academics, but the records did not reflect any standardized intelligence testing. What Campbell's attorney did not know was that the Harris County District Attorney's office had, in 1991, subpoenaed Campbell's school records, specifically requesting "psychological testing" results, and, at that time, received evidence that Campbell had taken at least two intelligence tests as a child. When he was nine years old, Campbell received a "deviation IQ" of 68 on the "Otis-Lennon Mental Ability Test." And, when he was seven years old, he performed in the lowest range of the "Metropolitan Readiness Test." In the period immediately following *Atkins*, this evidence of intellectual disability was, apparently, in the exclusive possession of the District Attorney's office.

In March 2003, Campbell's attorney requested from the Texas Department of Criminal Justice "results from any and all intellectual functioning tests completed by Mr. Robert James Campbell."[4] The department responded, in a letter dated March 31, 2003:

---

[3] We note that these "facts," which are presented in Campbell's motions to us, have not been subjected to the adversarial process in any trial court. In other words, this narrative has not been proven by a preponderance of the evidence. After the district court has conducted its review, the facts may turn out to be different than those alleged here. *Cf. In re Morris*, 328 F.3d 739, 741 (5th Cir. 2003) (after our grant of authorization for a successive habeas petition, the district court must conduct a "thorough" review to determine "conclusively" that the statutory requisites for a successive habeas petition are met).

[4] In March 2003, the one-year statute of limitations period for a federal habeas petition raising an *Atkins* claim had not yet lapsed. *Henderson v. Thaler*, 626 F.3d 773, 777 (5th Cir. 2010) ("The constitutional right asserted by Henderson was recognized by the Supreme Court in *Atkins,* which was decided on June 20, 2002. The limitations period commenced on that date and expired on June 20, 2003."); *In re Wilson*, 442 F.3d 872, 874 (5th Cir. 2006) (same).

The State's response incorrectly asserts that Campbell's initial *Atkins* claim was time-barred. However, Campbell filed his first *Atkins* state habeas application on May 28, 2003. After it was dismissed, Campbell had until July 26, 2003 to file his federal habeas petition. Campbell filed it on July 22, 2003, within the one-year limitations period.

> I am writing in response to your request dated March 21, 2003 asking for any and all intellectual functioning tests completed by inmate Campbell while incarcerated on a previous conviction . . . . As you know, inmates sentenced to death receive no intellectual testing upon incarceration.
>
> Our records indicate that inmate Campbell was previously sentenced to a five-year term for robbery on April 23, 1990 and received by TDCJ in May 1990. The admission summary for that conviction indicates an IQ test score of 84. Because the actual IQ test instruments are kept for only a few months, any such test instrument for inmate Campbell would have been destroyed long ago.

That letter contained two significant contentions. First, the department's letter stated that "inmates sentenced to death receive no intellectual testing upon incarceration." According to the representations and supporting evidence of Campbell's current counsel, that statement was incorrect or misleading. According to "clinical notes" of the Texas Department of Criminal Justice's Institutional Division which are in the record before us, in 1992, Campbell was administered the "WAIS-R IQ Short Form" (that is, the "Wechsler Adult Intelligence Scale-Revised Short Form") test and scored 71. According to the report of a psychologist, Dr. Leslie Rosenstein, that test, which was "designed to be a quick, short screening tool developed to save time, and not a comprehensive measure of intelligence," tends to "overestimate" intelligence. Thus, the 1992 test, which the department failed to disclose following Campbell's attorney's request for "any and all intellectual functioning tests," was evidence of intellectual disability.

Second, the department's letter stated that, in 1990, during his earlier incarceration on a robbery conviction, Campbell received an IQ test score of 84, which would suggest that he was not intellectually disabled. Apparently, nothing is known today about that score, including what test was

administered, what were the qualifications of the person who administered the test, and, indeed, whether such a test had been administered at all.

On May 28, 2003, Campbell's attorney, without knowledge of the three intelligence tests suggesting intellectual disability, filed in Texas state court an application for a writ of habeas corpus alleging, "based upon a good faith belief that Campbell may be mentally retarded," that his execution would violate *Atkins*. The attorney attached to the application two pages of school records demonstrating Campbell's failing grades and affidavits from Campbell's relatives and friends. The application requested an opportunity for discovery and an evidentiary hearing in state trial court. In response, the State argued that Campbell's "sparse school records" were insufficient to warrant further factual development and that the application should be dismissed. The Texas Court of Criminal Appeals agreed, held that the application was "insufficient," and dismissed it. *Ex parte Campbell*, No. WR-44551-02, slip op. at 4 (Tex. Crim. App. July 2, 2003) (unpublished).

Campbell, through his attorney, then requested from this court authorization to file a successive habeas corpus petition asserting his *Atkins* claim in federal district court. *See* 28 U.S.C. § 2244(b)(3)(A); *Felker v. Turpin*, 518 U.S. 651, 664 (1996) ("[A] habeas petitioner [is required] to obtain leave from the court of appeals before filing a second habeas petition in the district court."). As with the state application, the attorney attached to the federal motion for authorization the school records and affidavits. On November 13, 2003, this court held that the evidence was "simply not enough to demonstrate that his claim has any likelihood of success under *Atkins*," and, therefore, he failed to make a "*prima facie* showing of mental retardation" and was "not entitled to file a successive habeas petition in the district court." *In re Campbell*, 82 F. App'x 349, 351 (5th Cir. 2003).

Next, in federal district court, on November 25, 2003, Campbell's attorney sought funds for intellectual-function testing, and, on December 9, the request was denied. *Campbell v. Cockrell*, No. 4:00-CV-3844 (S.D. Tex. Dec. 9, 2003). A year later, on December 9, 2004, this court denied Campbell's request for the certificate of appealability needed to appeal the funding denial. *Campbell v. Dretke*, 117 F. App'x 946, 959 (5th Cir. 2004).

Throughout this litigation in the state and federal courts regarding Campbell's ability to assert an *Atkins* claim on the merits, the State never disclosed that it was in possession of evidence of three intelligence tests suggesting that Campbell was intellectually disabled.

Years passed. At some point, it is not clear from the record when, Campbell obtained new counsel, the attorneys representing him now. The new attorneys tell us that, in March 2014, they realized that the District Attorney's office subpoenaed Campbell's school records back in 1991. The new attorneys requested that the District Attorney's office provide copies of the records that had been produced to them. The District Attorney's office complied with the request. According to Campbell's counsel, upon receiving the records, the attorneys discovered that the District Attorney's office had received from the school two pages of documents that were not provided to Campbell's prior attorney when he made his request: the two pages reflecting the two intelligence tests. Later, it is not clear exactly when, or how, Campbell's counsel discovered the Department of Criminal Justice short form intelligence test that the department had failed to disclose when requested by Campbell's prior attorney.

No. 14-20293

In April 2014, Dr. Rosenstein, a board certified psychologist on referral from Campbell's counsel, evaluated Campbell for intellectual disability.[5] Dr. Rosenstein's evaluation included her administration of a series of intelligence tests and review of historical information about Campbell, including his school records and prior intelligence tests. Dr. Rosenstein's tests showed Campbell to have a full scale IQ of 69. Dr. Rosenstein diagnosed Campbell with "mild mental retardation."[6]

With the May 13, 2014, execution date fast approaching, on May 5, Campbell filed a subsequent application for writ of habeas corpus in Texas courts, attaching the new and newly discovered evidence, including the two intelligence test results from Campbell's childhood, the test result from the Department of Criminal Justice, and Dr. Rosenstein's report. On May 8, the Texas Court of Criminal Appeals dismissed the application as an "abuse of the writ" without further explanation. *Ex parte Campbell*, No. WR-445511-05, slip op. at 3 (Tex. Crim. App. May 8, 2014) (citing Tex. Code Crim. Proc. art. 11.071 § 5). Four members of the court dissented, contending that relevant evidence of Campbell's *Atkins* claim "was unavailable to him at the time that he filed his [earlier] application because he was given misinformation by one governmental entity, the Texas Department of Criminal Justice," and, with the new application, Campbell had presented "compelling evidence to show that he

---

[5] According to her curriculum vitae that is in the record, Dr. Rosenstein has a Ph.D. in Psychology from the University of Texas and specializes in Clinical Psychology, Neuropsychology, and Quantitative Methods. She has over 25 years of experience practicing and teaching psychology and neuropsychology and is certified by the American Board of Clinical Neuropsychology. She is a certified member of a comprehensive diagnostic and evaluation team for intellectual disability and is certified in advanced certified forensic evaluation. She has authored dozens of scholarly articles.

[6] On May 4, Dr. Rosenstein filed an addendum to the evaluation describing her review of certain new and clarified information. Her original diagnosis of mild mental retardation did not change.

is ineligible for execution under *Atkins*." *Id.* at 2, 3 (Alcala, J., dissenting). The dissenters admonished the court that it "should not base its decisions that determine whether a person will live or be executed based on misinformation or wholly inadequate information." *Id.* at 5. Only "[b]y reviewing [Campbell's] claim on the merits," the dissent concluded, would the court "fulfill its ultimate obligation to ensure that Texas abides by the constitutional prohibition against the execution of a mentally retarded person." *Id.*

On May 10, Campbell filed his motions for authorization to file a successive federal habeas petition and for a stay of execution with us.

## II.

We first address Campbell's motion for authorization for a successive habeas petition. Because Campbell has filed a federal habeas petition before, he must receive authorization from us to file another. *See* 28 U.S.C. § 2244(b)(3)(A); *Felker*, 518 U.S. at 664. For us to grant such authorization, we must determine that Campbell has made a "*prima facie* showing" that he satisfies the statutory prerequisites for a successive habeas petition. *See In re Morris*, 328 F.3d 739, 740 (5th Cir. 2003) (quoting 28 U.S.C. § 2244(b)(3)(C)). "Our court has adopted the following definition of *prima facie* showing: We understand it to be simply a sufficient showing of possible merit to warrant a fuller exploration by the district court. If in light of the documents submitted with the application it appears reasonably likely that the application satisfies the stringent requirement for the filing of a second or successive petition, we shall grant the application." *Id.* (quoting *Bennett v. United States*, 119 F.3d 468, 469-70 (7th Cir. 1997)) (alterations omitted).

If we grant such authorization, it is "'tentative in the following sense: the district court must dismiss the motion that we have allowed the applicant to file, without reaching the merits of the motion, if the court finds that the movant has not satisfied the requirements for the filing of such a motion.' The

district court then is the second 'gate' through which the petitioner must pass before the merits of his or her motion are heard." *Id.* at 741 (quoting *Reyes-Requena v. United States*, 243 F.3d 893, 899 (5th Cir. 2001), and citing 28 U.S.C. § 2244(b)(4)). The district court must conduct a "'thorough' review" to determine that the successive habeas petition is proper. *Id.* (quoting *Reyes-Requena*, 243 F.3d at 899).

In the circumstances of this case, Campbell must make a *prima facie* showing, first, that his *Atkins* claim was "not presented" in a prior federal habeas petition. 28 U.S.C. § 2244(b)(1); *see In re Morris*, 328 F.3d at 740. There is no question that Campbell's first federal habeas petition did not present an *Atkins* claim. *See* Petition for Writ of Habeas Corpus, *Campbell v. Johnson*, No. 4:00-CV-3844 (S.D. Tex. Nov. 11, 2000).

Second, Campbell must make a *prima facie* showing that his *Atkins* claim "relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2244(b)(2)(A); *see In re Morris*, 328 F.3d at 740. There is no question that *Atkins* created a new rule of constitutional law (*i.e.*, that the intellectually disabled are categorically ineligible for the death penalty), made retroactive to cases on collateral review by the Supreme Court. *See Mathis v. Thaler*, 616 F.3d 461, 467 (5th Cir. 2010) (citing *Morris v. Dretke,* 413 F.3d 484, 486-87 (5th Cir. 2005)). And it is obvious that, at the time when Campbell filed his first federal habeas petition in 2000, which was before *Atkins* was decided in 2002, the rule of *Atkins* was "unavailable" then. *See id.* (the new rule of constitutional law must have been "unavailable" "at the time [the petitioner] filed his first federal habeas application").

And third, Campbell must make a *prima facie* showing that he "should be categorized as 'mentally retarded' within the understanding of *Atkins*." *In re Campbell*, 82 F. App'x at 350. "A *prima facie* showing of mental retardation

is simply a sufficient showing of possible merit to warrant a fuller exploration by the district court.'" *In re Hearn*, 418 F.3d 444, 445 (5th Cir. 2005) (internal quotation marks, alteration, and citation omitted). Here, Campbell has made out a *prima facie* case.

Intellectual disability (or "mental retardation," *see supra*, note 1) "is characterized by: (1) 'significantly subaverage' general intellectual functioning; (2) accompanied by 'related' limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." *Ex parte Briseno*, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004) (citing American Association of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports (10th ed. 2002)) (footnotes omitted). "Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below." *Id.* at 7 n.24 (quoting American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders (Text Revision, 4th ed. 2000)).[7] "Impairments in adaptive behavior are defined as significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales." *Id.* at 7 n.25 (quoting American Association on Mental Deficiency, Manual on Terminology and Classification in Mental Retardation (Grossman ed., 1983)).

Here, the evidence in the record reflects two intelligence tests from Campbell's childhood indicating significantly subaverage intellectual

---

[7] "Psychologists and other mental health professionals are flexible in their assessment of mental retardation; thus, sometimes a person whose IQ has tested above 70 may be diagnosed as mentally retarded while a person whose IQ tests below 70 may not be mentally retarded. Furthermore, IQ tests differ in content and accuracy." *Id.* (citations omitted); *see also Ex parte Hearn*, 310 S.W.3d 424, 428 (Tex. Crim. App. 2010) ("There is a measurement error of approximately 5 points in assessing IQ, which may vary from instrument to instrument. Thus, any score could actually represent a score that is five points higher or five points lower than the actual IQ.") (internal quotation marks and citations omitted).

functioning. When he was nine years old, he received an IQ score of 68 on the Otis-Lennon Mental Ability Test and, when he was seven years old, he performed in the lowest range of the Metropolitan Readiness Test. The evidence further shows a third "short form" test from 1992 in which Campbell's IQ was estimated at 71. Taking into account Dr. Rosenstein's explanation that the short form test tends to "overestimate" intelligence, Campbell's results from that test likewise evince significantly subaverage intellectual functioning. Finally, we have the results from the intelligence testing that Dr. Rosenstein administered just last month (which, we are told, was administered using the "gold standard" instrument for such testing, the "Wechsler Adult Intelligence Scale IV"), in which Campbell's full scale composite IQ score was 69. In short, the record evidence contains the results from four intelligence tests administered during multiple periods of Campbell's life, including his childhood, each indicating significantly subaverage intellectual functioning. Further, Campbell's school records, which show that he failed almost all of his classes, are corroborative.

Regarding adaptive functioning, Dr. Rosenstein's report concludes that, although there are limits to the information available regarding Campbell's adaptive functioning because, among other reasons, Campbell has been imprisoned essentially his entire adult life, the information available is sufficient to warrant a diagnosis for intellectual disability. Dr. Rosenstein considered, among other things, that Campbell did not complete high school, received failing grades throughout his education, never received a driver's license, never received formal employment, and, as for his crime, appears to have never attempted to evade authorities and in fact took actions that made his apprehension more likely. Dr. Rosenstein also reviewed statements from individuals who knew Campbell during his childhood and adolescence stating that Campbell was "mentally slow/impaired," was "teased" about his

"behavior," "spent time with children much younger than he," and "was a follower," "not a leader." Dr. Rosenstein's report states that, during her testing of Campbell, he displayed difficulty accurately "calculating change from a purchase," "failed to accurately add time on a clock," and "could not answer simple questions about measurements or money savings." Similarly, there is also evidence in the record that, although Campbell did not have a driver's license, he drove cars at times and, at those times, was unable to read the gas gauge and had to ask others to explain whether the car had fuel. And, although Campbell wore a watch, he could not read it.[8]

As for the requirement that intellectual disability manifest before the age of 18, Dr. Rosenstein notes the intelligence tests from Campbell's childhood revealing significantly subaverage intelligence and Campbell's "long history throughout childhood of academic failures." As noted, the record has other corroborating evidence about Campbell's childhood manifestations of intellectual disability, *i.e.*, the statements from persons who knew him. Following Dr. Rosenstein's evaluation of the available information and her administration of the tests discussed in her report, Dr. Rosenstein diagnosed Campbell with "mild mental retardation."

The evidence in the record before us is more than sufficient to satisfy Campbell's burden of making out a *prima facie* showing of intellectual disability sufficient to warrant a successive habeas petition. *Cf. In re Morris*, 328 F.3d at 741 (Higginbotham, J., concurring) (joining order authorizing

---

[8] However, we also note that the State indicates that the trial record contains evidence that Campbell did not exhibit deficits in adaptive functioning. The jury heard evidence that Campbell was an "average child." Campbell could drive stick shift, mowed yards for money, and was even entrusted to babysit. According to the State, the evidence developed at trial showed that, in the criminal world, Campbell was not a follower, but a leader. In the crime at issue, Campbell, not his co-defendant, was the one who shot Rendon. Campbell was also the one to appropriate Rendon's car and possessions.

successive habeas petition asserting *Atkins* claim even though the evidence regarding intellectual disability was "conflict[ing]" and "we have no IQ test"). Indeed, four members of the Texas Court of Criminal Appeals found Campbell's evidence of intellectual disability "compelling." *Ex parte Campbell*, *supra*, at 2 (Alcala, J.). We reiterate, of course, that the evidence in the record before us has not been subjected to the rigors of the adversarial process and it may ultimately appear differently than it does now. *See supra*, note 3. We find, however, that, from our vantage, the evidence shows more than sufficient "possible merit to warrant a fuller exploration by the district court." *In re Morris*, 328 F.3d at 740 (citation omitted).

However, Campbell's claim of ineligibility for the death penalty was filed more than ten years after the date the Supreme Court decided *Atkins*. *See* 28 U.S.C. § 2244(d)(1)(C) (providing a one-year statute of limitations for a claim based on a decision of the Supreme Court made retroactively applicable to cases on collateral review).[9] Therefore, unless equitable tolling applies, Campbell's petition is time-barred. *In re Henderson*, 462 F.3d 413, 417 (5th Cir. 2006) (citing 28 U.S.C. § 2244(d)(1)). Equitable tolling is to be "applied restrictively" and should be "entertained only in cases presenting 'rare and exceptional circumstances where it is necessary to preserve a plaintiff's claims when strict application of the statute of limitations would be inequitable.'" *In*

---

[9] We have the authority to deny a motion to authorize based on timeliness. *See In re Lewis*, 484 F.3d 793, 795–96 (5th Cir. 2007). *See also In re Vassell,* No. 13–284, 2014 WL 1779039, at *4 (4th Cir. May 6, 2014). *But see In re McDonald*, 514 F.3d 539, 543 (6th Cir. 2008) ("[I]nvestigating compliance with the one-year statute of limitations outlined in 28 U.S.C. § 2244(d) . . . is not within the purview of the court of appeals' consideration of applications requesting authorization to file a second or successive habeas corpus petition pursuant to 28 U.S.C. § 2244(b).").

*re Wilson*, 442 F.3d 872, 875 (5th Cir. 2006) (quoting *Fierro v. Cockrell*, 294 F.3d 674, 682 (5th Cir. 2002)).

The delay gives us pause, but we conclude that, under the applicable law and these circumstances, we are not precluded from authorizing the filing of a successive habeas petition here. It would not be appropriate to deny the motion to authorize where Campbell has brought forth a viable basis for equitable tolling that merits further factual development.[10]

The evidence presented by Campbell at this stage indicates that, in 2003, the District Attorney's office had in its possession evidence reflecting Campbell's IQ score of 68, yet the State opposed Campbell's 2003 motion to authorize a successive habeas claim based on *Atkins* on the basis that the "sparse" school records failed to establish intellectual disability. The State also asserted that there was no "credible evidence" of intellectual disability. Also in 2003, Campbell sought funds for intellectual-function testing, which the State opposed even though the District Attorney had evidence of the IQ score of 68.

Moreover, according to Campbell, the Texas Department of Criminal Justice informed Campbell's prior attorney that, during Campbell's earlier robbery incarceration, he received an IQ test result of 84. As Campbell now argues, that was not true and contrary to the actual evidence. It is not facially unreasonable that Campbell's prior attorney relied upon the department's

---

[10] Moreover, in the context of considering a request for certificate of appealability, this court may "determine whether the facts in th[e] record entitle [the petitioner] to equitable tolling, or whether further proceedings" are necessary. *Henderson v. Thaler*, 626 F.3d 773, 779 (5th Cir. 2010) (citing *Holland v. Florida*, 560 U.S. 631 (2010)). Yet we have also recognized that in certain circumstances, it is best to "'leave it for the district court to decide whether [a petitioner's] case presents the 'rare and exceptional circumstances' that would entitle him to the benefit of equitable tolling.'" *In re Mathis*, 483 F.3d 395, 400 (5th Cir. 2007) (quoting *In re Henderson*, 462 F.3d at 417)).

14

statement and was persuaded that it was fruitless to pursue this claim further. Indeed, as Judge Alcala of the Texas Court of Criminal Appeals stated in her dissent, "it would be unjust to penalize an applicant for not uncovering such a falsehood previously when he had no basis to believe that a falsehood had been conveyed to him." *Ex parte Campbell*, *supra*, at 5.[11]

Accordingly, "based on the record in this case, it is unclear if equitable tolling is warranted." *In re Mathis*, 483 F.3d 395, 400 (5th Cir. 2007). Under these circumstances, "it is premature for us to address [equitable tolling]," *In re Henderson*, 462 F.3d at 417, and the district court will be best-positioned to resolve whether equitable tolling applies.

Campbell has made the requisite *prima facie* showing for authorization to file a successive federal habeas petition asserting his claim of ineligibility for execution under *Atkins*. His motion for authorization will be granted.

---

[11] *See also Coleman v. Thompson*, 184 F.3d 398, 402 (5th Cir. 1999) ("Equitable tolling applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights.") (internal quotation marks and citation omitted); *Munchinski v. Wilson*, 694 F.3d 308, 330 (3d Cir. 2012) (holding that state habeas court's dismissal of petitioner's state habeas petition, "with its implicit [erroneous] suggestion that [the petitioner] refile once his federal appeal was resolved, was sufficiently misleading as to constitute an extraordinary circumstance because 'it later operate[d] to prevent [the petitioner] from pursuing his rights'") (quoting *Urcinol v. Cathel*, 546 F.3d 269, 275 (3d Cir. 2008) (third alteration in original); *Williams v. Thaler*, 400 F. App'x 886, 893 (5th Cir. 2010) (unpublished) (holding that the petitioner was entitled to equitable tolling when he repeatedly inquired about status of his state habeas petition and Texas Court of Criminal Appeals affirmatively misled him by stating that the petition was still pending when in fact it had already been denied); *Spottsville v. Terry*, 476 F.3d 1241, 1245 (11th Cir. 2007) (holding that equitable tolling was permissible when state court misled the petitioner); *Lawrence v. Florida*, 421 F.3d 1221, 1226 (11th Cir. 2005), *aff'd on other grounds* 549 U.S. 327 (2007) (stating that "extraordinary circumstances" include "when the State's conduct prevents the petitioner from timely filing"); *Curtiss v. Mt. Pleasant Corr. Facility*, 338 F.3d 851, 855 (8th Cir. 2003) (equitable tolling warranted when "the [government's] conduct has somehow lulled the petitioner into inaction"); *Knight v. Schofield*, 292 F.3d 709, 712 (11th Cir. 2002) (granting equitable tolling when petitioner was misled by state habeas court).

No. 14-20293

## III.

Now, having authorized Campbell to file a successive federal habeas petition asserting his *Atkins* claim, the question is whether we should stay his execution, scheduled for Tuesday, May 13, pending resolution of the authorized *Atkins* claim. "In deciding whether to issue a stay of execution, we are required to consider four factors: (1) whether the movant has made a showing of likelihood of success on the merits, (2) whether the movant has made a showing of irreparable injury if the stay is not granted, (3) whether the granting of the stay would substantially harm the other parties, and (4) whether the granting of the stay would serve the public interest." *Buxton v. Collins*, 925 F.2d 816, 819 (5th Cir. 1991); *accord Nken v. Holder*, 556 U.S. 418 (2009). Or, if the movant does not show a "'probability' of success on the merits, he must 'present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities (*i.e.*, the other three factors) weighs heavily in the favor of granting the stay." *O'Bryan v. Estelle*, 691 F.2d 706, 708 (5th Cir. 1982) (quoting *Ruiz v. Estelle*, 666 F.2d 854, 856 (5th Cir. 1982)).

Here, "we think [Campbell] has made a sufficient showing of likelihood of success on the merits that the public interest would be served by granting the stay." *In re Morris*, 328 F.3d at 741. As discussed, Campbell's evidence supporting his *Atkins* claim, which includes multiple intelligence tests administered during various periods of Campbell's life and consistently suggesting intellectual disability, is strong. *See Ex parte Campbell*, *supra*, at 2 (Alcala, J.) ("compelling"); *cf. In re Morris*, 328 F.3d at 741 (Higginbotham, J.) (joining order staying execution despite the "conflict[ing]" evidence of intellectual disability). "We see nothing upon which we could determine that 'the granting of the stay would substantially harm the other parties,' including the State of Texas." *Id.* at 741 (per curiam).

It is regrettable that we are now reviewing evidence of intellectual disability at the eleventh hour before Campbell's scheduled execution. However, from the record before us, it appears that we cannot fault Campbell or his attorneys, present or past, for the delay. According to Campbell, in the period immediately after *Atkins* was decided, his attorney diligently searched for evidence of intellectual disability.[12] And, when the Texas Department of Criminal Justice failed to turn over the results of the intelligence test they had administered on Campbell upon the attorney's request for "*any and all* intellectual functioning tests," the State gave the attorney incorrect and incomplete information. Thus, although the delay is regrettable, we do not see it as militating against a stay of execution in this case. *Compare Walker v. Epps*, 287 F. App'x 371, 376-77 (5th Cir. 2008) (King, J., dissenting) (collecting cases in which this circuit has disfavored stays of execution "when inmates have been aware of their potential claims but delayed filing suit"), *with In re Hearn*, 376 F.3d 447, 458 (5th Cir. 2004) (staying execution to allow assertion of *Atkins* claim where, *inter alia*, the petitioner was "not dilatory" in searching for an attorney to represent him in asserting the claim).

"[T]he Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." *Atkins*, 536 U.S. at 321. We have been presented with evidence that Campbell, who will soon be executed unless we intervene, may not constitutionally be executed. "In a capital case, we must be particularly certain that the legal issues have been sufficiently litigated, and the criminal defendant accorded all the protections guaranteed him by the Constitution of the United States." *O'Bryan*, 691 F.2d at 708.

---

[12] Regarding Campbell's attorney's diligence, we note that he also sought funding for intelligence testing and was denied. *Campbell v. Cockrell*, No. 4:00-CV-3844 (S.D. Tex. Dec. 9, 2003); *Campbell*, 117 F. App'x at 959.

No. 14-20293

Because of the unique circumstances of this case, Campbell and his attorneys have not had a fair opportunity to develop Campbell's claim of ineligibility for the death penalty. In light of the evidence we have been shown, we believe that Campbell must be given such an opportunity. The motion for a stay of execution pending resolution of Campbell's *Atkins* claim will be granted.

*\*  \*  \**

IT IS ORDERED that movant's motion for authorization to file a successive habeas corpus petition is GRANTED.

IT IS FURTHER ORDERED that movant's motion for stay of execution scheduled for Tuesday, May 13, 2014 is GRANTED.